Good morning, ladies and gentlemen. You may notice that our third chair is empty. Our friend and colleague, Judge T.G. Nelson, had an operation last week and he's doing fine but was unable to travel. So he will be listening to the tape of the argument and then we will confer after that. So it's very important today that you speak on the microphone if you want Judge Nelson to hear you. So with that will be our argument in the case of Public Citizen v. NRC. Do you have a time allocation for each side? The State of New York and I would like to split petitioners' time and each reserve two minutes for rebuttal. Okay. Move the microphone close to you. And will you speak up so that I can hear you? Sure. May it please the Court, my name is Adina Rosenbaum and I represent petitioners' Public Citizen and San Luis Obispo Mothers for Peace. The Nuclear Regulatory Commission is charged with ensuring that the use of nuclear materials provides adequate protection to the public health and welfare. But the Commission based its decision of what threats nuclear licensees should be required to be able to protect against, including the size of the adversary force they should be required to be able to protect against. Not on the nature of the threats that they are reasonably likely to face and therefore would need to be adequately protected against, but on what they thought could be expected of private security forces. And they decided not to require nuclear licensees to be able to protect against air attacks, despite a specific direction from Congress that they consider the threat of air attacks in promulgating this rule. The Commission's decision to base its design basis threat rule on its beliefs of what should be expected of private forces, instead of on the nature of the attack that they might see, suffers from two fatal flaws. First, it fails to provide an adequate explanation of the basis of the rule. We don't know what the Commission based its decision on. It does not explain what factors went into its decision of what threats it thinks a private security force can reasonably be expected to protect against. The only example it provided in the final rule was that private security forces can't have certain types of weapons. But it invoked its reasonable expectations limitation in discussing also the size of the adversary force. And weapons of a certain type would not necessarily be necessary to protect against a large adversary force. The main limitation in protecting against an adversary force above a certain size would be the expense of employing a defensive force large enough to counter that adversary force. But the Commission states that it did not consider cost in promulgating its final rule. And, indeed, it concedes that cost would be an improper factor to take into account in coming up with what is necessary for adequate protection. If cost was not one of the factors that it took into account, though, it's difficult to perceive what those factors would be as they relate to the size of the adversary force. What do you make of the Commission's statement in its rule that it did consider the size of the adversary force and the number of assault teams, did a probabilistic analysis of the terrorist group and so forth? I mean, there's a fairly lengthy paragraph addressing that issue. Why do you think that's inadequate? Well, it talks about when it says how it came up with the size of the force, it says that it believes that the force is the largest adversary force that a private security force can reasonably be expected to defend against. So it doesn't state so that's looking at the size of the force instead of at what would be necessary for the force to be able to defend against. And its contention that because it's – its contention that this reasonable expectations limitation leads to a reasonable assurance of adequate protection is illogical. The rule does not ensure any protection against threats that are larger than those the Commission thinks a private security force should be expected to protect against, leaving nuclear licensees unprotected against forces larger than that size. And although the Commission states that its decision is based on assumptions about what other agencies will do and what the national security forces will do, it does not make a finding that those other agencies will provide adequate protection against threats larger than those that its reasonable expectations limitation would cover. In fact, the rulemaking discussed what would happen in the case of larger-than-design-basis threat attacks, talking about how private security forces would be expected to do their best against those attacks with limited results, indicating that the Commission did think it was likely that those sorts of attacks or reasonably likely that those sorts of attacks would happen, but no one would be fully prepared to protect against those. The final rule is also arbitrary and capricious and contrary to law in failing to require licensees to defend against air attacks. In the Energy Policy Act of 2005, Congress required the agency to consider the threat of air attacks and the events of September 11th in general in revising its design-basis threat rule. And at the very least, the command that an agency consider a threat in promulgating its rule must mean that the agency finds that such a threat exists, which the Commission did do here. It talked about how it was not discounting the threat of air attack. That then must account for and address that threat in its final rule, which the Commission did not do here. None of the reasons that the Commission provided for not requiring protection against air attacks provides a rational reason for not requiring such protection. First, the Commission stated that licensees cannot engage in active protection against the air attack because that would require military weapons and ordnance. But that does not explain their failure to require passive protection against air attacks, such as through the construction of a beam hinge, as suggested in the majority of the comments. And there is precedent for requiring passive measures as part of the design-basis threat rulemaking. In the 1994 vehicle bomb rule, the rule required licensees to erect vehicle barrier systems. Second, the Commission discussed the efforts other agencies take to protect against air attacks. Mentioning efforts such as comparing passengers against no-fly lists or having increased marshal presence on airplanes. But notably, although the Commission has claimed in its briefs that the work of other agencies justifies a finding that licensees are adequately protected against air attacks, it did not make such a finding in the rulemaking. Finally, the Commission claims that mitigation efforts would suffice to protect against air attacks. But the Commission provides no explanation for why it would prefer mitigating the effects of an air attack over preventing such an attack in the first place. And it provides no explanation of why mitigation would suffice to protect against air attacks, but not suffice to protect against water- and vehicle-based attacks, which are included in the final rule. And I should note that the final rulemaking stated that everything included in it was necessary for adequate protection. So it's not that the Commission was going above and beyond what was necessary for adequate protection in requiring protection against water- and vehicle-based attacks. Given that Congress specified that the Commission should consider air attacks in this rulemaking, it should at least have provided a rational basis for treating air attacks differently from other sorts of attacks, and it did not provide that rational explanation in not requiring nuclear licensees to protect against such attacks. Thank you, Counsel. Thank you. Good morning, Your Honors. John Sipos, Assistant Attorney General for Petitioner of the State of New York. It was inconsistent and arbitrary for the Nuclear Regulatory Commission to tell reactor owners not to worry about air-based attacks while elsewhere the NRC acknowledged the existence of air-based threats. It was also inconsistent for the NRC not to examine the environmental consequences of that exclusion decision. The NRC goes about dealing with threats in a two-step process. The first step or the first part is the NRC first tells reactor owners what threat they should be prepared to deal with, and that is in 73.1, which is the regulation which is at issue in this case. The second step, or in the second step, the NRC tells reactor operators how to go about defending against the threat it has identified. That's mostly in Section 73.55, which is not directly at issue, the NRC tells us, in this case. Indeed, the NRC's final decision made frequent reference about how they were deferring or postponing the 73.55 determination until later. But the upshot of the NRC's decision here is by excluding air threats from 73.1, from Section 73.1, it has exempted and it has relieved reactor operators from any obligation to do anything about air threats. And the New York State submits that this is a rational decision-making. Haven't they stepped up their ability to handle a problem should an air threat occur? You know, the means of getting out fires and preventing it from nuclear materials getting away from them. They've increased that, haven't they? Judge Hall, I think the answer is it appears they may have, but in reality they have not. And that goes to the so-called B5B order, which was issued in February 2002. And from what we can tell from public statements about that rulemaking, or excuse me, about that order, is that the NRC told reactor owners to use already existing, that's a phrase, or readily available resources. So they were essentially telling the reactor operators, better get ready after an airplane strikes, after there is a large fire and explosion which takes out or makes large portions of the facility unusable, please be ready to deal with the fire. And that is, it really is an after-the-fact response. What they're saying is that somebody else is going to get the plane down, but if they don't and the plane gets through, you've got to be ready to handle the mess on the ground. Yes. And that is somewhat commonsensical, but that after-the-fact reaction really does not address the damage that could result right from the impact itself. And in the rulemaking proceeding, there were various studies were identified. One was the Argonne study, talking about the vibrations that can result from when a large aircraft at a certain amount of speed hits a facility, the shock waves. And we've also cited the relay chatter document. So there are damages that can happen right away, right upon impact. And B-5B actually also acknowledges the existence of the threat. So we have the NRC in B-5B saying, acknowledging that there is the threat of large commercial aircraft striking facilities and causing large fires and explosions. We have the NRC stating in its rulemaking that it does some drills. We have the FEMA test, where FEMA hypothesized a large plane being hijacked and heading straight for Indian Point, which is in the state from where I'm from. And so we have federal agencies acknowledging the existence of this threat. And, again, that's one of the things we think is inconsistent, how you can acknowledge the threat elsewhere but not put it in 73.1. And New York is concerned about it. Well, a three-dollar provision is not supposed to do everything. It's one of the provisions that deals with this area. It, it, the, the, yes, we have a federal government and the NRC recognized that there is active, there are active measures that other entities could use. But it still leaves a gaping hole for, for, for the strike itself and for, for what could happen. And New York is concerned because as, as we've set forth in the, in the brief and as from the number of statements, the NRC acknowledges that these facilities were not designed to withstand impacts. And, and these, these, these facilities are, are old and they're, they were designed, many of them were designed in, in the 60s when, when this was not even remotely conceived. Indian Point was in the mid-60s. The Mark 4, or excuse me, the Mark 1 oil water reactors, which were discussed, are also of concern. So NRC has, has acknowledged that. And even the federal government, the Department of Homeland Security says that the threat level here, and I think the court can take judicial notice of this, is yellow for the country, but except for the aviation industry in which it is orange.  But, but there are many inconsistencies here. There are departures from previous rulemakings. There are departures from the process that they used in 1991 and 1994 when they saw, when, when the NRC examined, does this, has this threat happened? And the, and it was a straightforward inquiry. Now for, for air-based threats, it's, it's, it's a different inquiry altogether. So it's a departure from 1991 and 1994 from the truck bomb. It's, it's really inconsistent with some of the conclusions reached in, in 1994 as well. And I'll touch that a little bit more in the NEPA section. But there was a finding that in 1994 that a truck bomb could have a serious consequence. And that justified the 1994 rule. There's... But this was, we were going to do some extra protection. Yes. But there already was adequate protection. So I don't know that your, your barrier is to hold the truck bomb away from the plan or, or lead you anywhere here. Well, the, the NRC did examine, they did a probabilistic risk assessment, and I'll tie that right into NEPA right now, in which they, they posited a truck bomb at certain locations and, and what would happen and determined that it could have a consequence. So from a NEPA perspective and from an atomic energy perspective, fast forward to 2007, that, that, that holding still holds, holds, holds weight. And, and the discussion between Circuit Judges Becker and Siric in the Third Circuit in the Limerick Ecology case, I mean, I think that discussion's been resolved. This is a credible threat and the consequences are, are readily ascertainable. And now it is, you know, the, the truck issue has come within adequate protection. What the NRC did here is also inconsistent with how it dealt with other threats. It said, well, for, for cyber attacks and for water and for vehicles that, that, that they should be included. But for air, they, they, they came up with the after the fact mitigation. That's inconsistent. It's, and it's also inconsistent, as I mentioned before, regarding the vibrations in the relay chatter. And, and, and so this, the State is left with the conclusion that the determination here was infected by considerations of costs or proxies for costs. B5B looks like there are costs there. Reasonable expectations, that sounds like costs. I think you also have a question of whether you want a standing army at each one of these facilities or whether you want civilians operating anti-aircraft guns. I think there are other considerations that cost. And, Judge Hall, I want to be very clear. New York State is not advocating an active defense here. New York is suggesting that there are passive measures. And, and NEPA, and I, I know my time is expiring, but, but, but, but NEPA tries to encourage federal agencies to look at alternatives to have reasoned decision making, as does the Administrative Procedures Act. And there are possibilities. Other nations are looking at this. There's a European experience from, from German and French reactors and elsewhere, which was cited in the National Academy of Science report, which is in the record. There's a, there are a number of options there. And, and for, for passive, for passive defense, the Germans are experimenting with artificial fog. There, there are perhaps ways to, to, to blunt or protect the facility. In closing, and I know my time is, is, is rapidly expiring, it is a major federal action under NEPA. There are 104 operating reactors. There, each reactor has with it a spent fuel pool. So there are 104 spent fuel pools. And the, and the environmental assessment, and, and, and I would just reiterate or refer the Court to page E66 of the record, it's, it's, brief doesn't begin to describe it. It, it, there's no real substantive alternatives. I was tempted to say where's the beef. I'm not even sure there's a bun around this, this environmental assessment. I'd like to reserve the rest of my time for rebuttal. Thank you, Your Honors. Thank you, Counsel. Good morning. My name is Stephen Crockett. I represent the respondents in this case, both the U.S. Nuclear Regulatory Commission and the United States. I will be speaking to you for 15 minutes, and representative of NEI will have the remaining five. Clearly, from what you've heard this morning, the chief argument in the case, the chief question in the case is whether there's a rational basis for the design basis threat rule. I'm sorry. I'm having trouble hearing you. Would you speak a little louder and a little slower? Yes. Thank you. You might move the mic a little closer. There we go. Yeah. Okay. Can you hear me now? Yes. The chief question in the case, as is clear from what you've heard this morning, is whether we have a rational basis for the rule or whether we're simply covering up cost considerations and limiting the statutory direction for adequate protection by some notion of reasonable expectation. Let me address first, try to sum up as quickly as I can, what we believe the basis was for our finding that the DBT provided adequate protection. Certainly one of those elements is the threat assessment that Judge Thomas alluded to earlier, a statistical study of the kinds of threats that there have been, including outliers, not simply averages. Another factor, though, is the design of the facilities themselves. We did, as is recorded in the preamble to the rule, engineering studies, which showed not only was there a low likelihood that a direct impact could cause core damage, but that there would be sufficient time even in the event of an impact for mitigative activities. Those activities, by the way, are the subject of current rulemaking, and the draft final rule is before the commission for a vote now and is publicly available. But I take it the commission did not reject the notion that passive restraints might be successful in limiting initial damage, right? No. In other words, there was no finding that this was, that these wouldn't be successful, methods of preventing damage. The finding was that post-mitigation efforts or post-mitigation, I guess, strategies, if you will, would be sufficient. Is that right? No. Not mitigation activities by themselves, by any means. The design of the facilities provides some passive defense in and of themselves. Active defenses are provided by other agencies. Mitigation is a third factor. Right. I'm actually just talking about the, if you don't mind, just talking about the passive defenses. Okay. I think I used the phrase post-mitigation. What I meant is post-accident mitigation efforts. But in reading this, if I'm reading it correctly, the commission rejected the post-accident or post-incident mitigation strategies as being adequate in the cases of land and water attacks. Is that right? I don't believe so. It's true that they are incorporated in the design basis threat, and you've heard New York say that it's inconsistent of the agency to include those two threats but not others. We have argued in the brief that the two threats are handled by other agencies. The three threats are handled by other agencies in very different ways. Every single commercial flight in the United States is tracked by the FAA. There's simply more active preventive defense in the case of air than there is in the case of land or water. Well, I understand that. I guess the question is why, leaving that aside, why would post-incident mitigation strategies be rejected in favor of some other passive restraints in the case of land and water and not in the case of air? They are not being rejected in the case of land and water. We have talked about ñ I understand that the impression can be left that that's the case because we've talked about mitigation almost entirely in connection with the air threat, I mean here this morning and in the briefs. But, in fact, the mitigation orders, what Mr. Sipos referred to as the B5B orders, and the rulemaking that's going on now address mitigation of fires and explosions from whatever source, be it land, water, or air, be it terrorism or not. Well, I assume that the so-called B5B orders are robust and encouraging post-incident mitigation efforts. But I guess I see ñ maybe I'm missing the argument. But in the case of land and water, the commission said you need passive restraints. Here, in the case of air attack, the commission is saying passive restraints aren't necessary because we have adequate post-mitigation strategies in place. To me it seems like there's a bit of an inconsistency and a bit of leap of logic there. I'm ñ and maybe I'm having difficulty understanding New York's inconsistency argument. But it seems to me that it's not simply a question of mitigation. There are also elements of design, consideration of where the threat is most likely to come from, a comparison of the ways in which federal agencies provide different levels of protection for the different threats. To come back to what you said at the very beginning when this discussion began, you asked me whether we had rejected the feasibility of more passive defenses in the case of air. And I think it's fair to say no, we did not reject that. We did not think it was necessary for the reasons I've given for the sake of adequate protection. But the threats are under continuous assessment by the agency. And as our colleagues among the petitioners have pointed out, we in fact have a rulemaking that would have new reactor applications address how they would contend with such a threat in the design of the facility. We think that's more than is necessary for adequate protection. But it shows that we are continuing to assess the air threat, but we do believe there's adequate protection now in the three respects that I've enumerated. You've talked about the design-based protections that are in place. How are those different in the case of an air threat as compared with land or water? The engineering studies are going to – I'm not giving away classified information or safeguards information to say what I'm about to say. The engineering studies have to look at rather different aspects of the attack. Weight, angle of attack, velocity, all these factors are going to differ according to whether the attack comes – or at least differ in important respects according to whether the attack comes from the land, the water, or the air. The engineering studies in the case of the air threat focus almost entirely on the kinds of threats that can be expected from the air. I'm sorry, did that answer your question? Well, I guess in general terms, yes. But, for example, the truck bomb that explodes close to the facility would pose the same kind of – not quite the same kind of threat. Can you point me to a study that's not classified that's in the record that would speak to that? The studies that are in the record – I can't point you to unclassified studies. Unclassified material – the engineering studies that are referred to in the preamble are classified. If I could – let's see, I have about five minutes left. Let me focus on a much, I believe, misinterpreted sentence in the record on E10. The sentence says roughly that the rule represents the largest adversary force that can be reasonably expected of licensees to protect. And then there's a sentence which follows on that that says if – and I'd like to focus on this sentence – if licensees comply with the DBT, that provides adequate protection. These two sentences, I believe, are used by petitioners to argue that we are covering up cost considerations or that we have allowed this notion of reasonable expectation to somehow limit the statutory direction to provide adequate protection. First, as to the cost matter, look at the context of the sentence. We are addressing the very claim made here this morning that the DBTs are defined by cost considerations. And we say that's simply not true, that the rule text set out the largest adversary force that could be reasonably expected to defend. In other words, we use the notion of reasonable expectation as a counter to the claim. We distinguish it very clearly in that context from the notion of cost. We are looking at threat, we are looking at a reasonable division of the labor between private and public forces. As we said in 1994, even if a truck bomb is delivered by an enemy of the United States, that's no reason why licensees can't, in practical terms, defend against it. There, it's not so much a consideration of cost that we have in mind, it's a consideration of reasonable division of labor between private and public resources. Also, we are not using the notion to limit the idea of adequate protection. Petitioners focus on that one sentence that says if you comply with the DBT, the NRC is assured of adequate protection. But that's all against the background of the assumption that Ms. Rosenbaum alluded to earlier, that we are taking into account the resources that are made available by federal agencies in providing preventive action against air threat. So we would not want the court to misread these statements. We think in the context of the preamble, it's clear that reasonable expectation is a notion based both on threat assessment and a reasonable division of the labor. It does not somehow cover up cost considerations or limit the notion of adequate protection. If I may, in the last two and a half minutes, I have here deal with the notion of adequate protection. With the biological diversity case, which we discussed in our brief, and which was raised by both of the petitioners. In that case, you may recall the circuit sent a transportation rule back for, among other things, a revised environmental assessment. Petitioners in this case had argued that the rule should be sent back to the agency for an environmental impact statement. But in light of the amended biodiversity case, that's no longer a question. And the main question is whether we should be doing some kind of revised environmental assessment. I would remind the court what John Sipos has already reminded you of. We do in fact explain, Mr. Sipos thinks the explanation is too brief, but we do explain why we thought no environmental impact was caused by this rule. And the reasons were essentially that we were increasing neither the probability nor the consequences of theft or sabotage of nuclear materials. Nor were we amending standards of release of radioactive material to the environment in any way. That is an argument that we have steadily adhered to in the design basis threat rule makings over the years. It's not a new argument. Petitioners argue that under the biodiversity case, though, that our explanation is simply too short. The biodiversity case is essentially a case calling on transportation to do a cumulative impact analysis of the effect of the transportation rule having left in place a continuing increase in carbon emissions. That's not what we have here. We are not in any way contributing to some kind of cumulative impact of emissions. And so I would distinguish that case from the case of the DBT. And my time is up. Very well. Good morning. My name is David Repka and I represent the Nuclear Energy Institute. NEI represents the interests of the owners and operators of nuclear power plants in the United States. And I'm going to talk briefly about the DBT rule that's at issue here today. In general, the petitioners have painted a picture of government inaction and penny-pinching on behalf of the industry and abdication of responsibility. And that picture is grossly inaccurate. Physical protection of nuclear plants in the United States from all credible threats, including the threat of air attacks, is provided by a comprehensive set of requirements, physical measures, licensee actions, integrated government initiatives, many of those specifically undertaken in response to the events of 9-11. And as a result, and as recognized by the National Academy of Sciences, which is cited by the NRC, nuclear power plants are the most robust, best-protected elements of the critical infrastructure of the United States. The nuclear industry alone has spent in excess of $1 billion to increase physical protection of nuclear plants since 9-11. Did your clients oppose the requirement that beam hinges or some other form of passive protection be included in the rule? NEI's position is that that's not necessary to have beam hinges. At this point, I don't think that either the NRC or the industry knows what a beam hinge would be. It's an idea that's really only conceptual at this point. It's an idea that would introduce potentially more safety problems than it would resolve. And at this point, it's simply not necessary, given everything else that the NRC credited. Yes, the NRC didn't make any of those findings, except that it wasn't necessary, right? I believe that's correct. In the rulemaking itself, I think the NRC has considered beam hinges and understands the problems that they would entail. Well, the only paragraph I saw just simply said it's not necessary. It didn't talk about problems. It didn't talk about increased safety issues. Is there some other paragraph I'm missing or some other section? Not that I can point to offhand. I know that it's an issue that has been discussed in the briefs, and the NRC has spoken of the fact that the idea, again, is only conceptual and one that they didn't feel they needed to develop further. I would say that the NRC has shown that where they felt that further actions are necessary to protect security and public safety, they've had absolutely no qualms about imposing those requirements on the NRC or on the nuclear industry. Certainly the orders that were issued shortly after 9-11 are a good example of that. The industry had to respond fairly aggressively and very quickly to enhance its security. So the NRC has shown that it can respond to the threat environment and impose requirements that are needed on the industry. Now, I think it's really important to emphasize that the NRC did find that there's adequate protection based on a lot of things, not just mitigation capability. Protection is provided by the physical design of the plants. These are robust structures designed for large earthquakes, designed for other assaults, by licensing existing security measures, by mitigation and response capabilities, and by other federal and government capabilities. There is always a combination of active measures and passive measures in security. Judge Thomas, you talked about the truck bomb earlier this morning. Protection from truck bombs is often provided by passive measures, but not entirely. There are active measures that are involved in truck bombs, such as vehicle searches at checkpoints to assure that the vehicles aren't carrying bombs. There is always a question of what is adequate protection. That's a decision that really rests on the deference or the discretion of the agency. There is always a bigger bomb that one could postulate than what the NRC requires to be protected from. And so at some level, the agency and the industry always must rely upon a combination of mitigation capabilities and physical protection. The situation with the air attack is no different, and that's ultimately the NRC's decision to decide what is adequate protection. And when you get down to the final analysis, this is a deference case, a case where the NRC in its expertise, in combination with its discussions with the intelligence community, with other agencies of the federal government, has made a determination as to what is adequate protection. And that is based on many factors in excess of cost. Thank you, counsel. We'll have two minutes each for rebuttal. Two each, yes. First, I'd just like to read to you the quote that I believe Mr. Crockett was referring to on page E10 of the appendix. What it says is, the rule text set forth at section 73.1 represents the largest adversary against which the Commission believes private security forces can reasonably be expected to defend. Thus, when the DBT rule is used by licensees to design their site-specific protective strategies, the Commission is thereby provided with reasonable assurance that the public health and safety and common defense and security are adequately protected. So they're basing their finding of adequate protection on this reasonable expectations limitation. And again, even if that means some assumptions about what other agencies are doing, the Commission does not make findings that those other agencies' actions provide adequate protection against the beyond-design-basis threats. Second, although Mr. Crockett discussed various reasons why there might be protection against vehicle and water-based attacks and not against air attacks, that explanation is not in the final rule. There is no finding, for example, that because of the actions of other agencies, licensees are better protected against air attacks than they are against water and vehicle-based attacks. There's no explanation for treating those threats differently. Finally, I just want to touch on the NEPA issue. The explanation that the agency gave in its environmental assessment for not finding a significant impact on the environment was that the orders that it had previously put in place, that there was no difference between this rule and those orders. So there was really no change. But an agency cannot avoid its NEPA obligations by instituting actions through order, and then when it undergoes the proper rulemaking proceeding, only then saying that there's no difference from those previous orders. And the Center for Biological Diversity case specifically states that just because a final rule may be an improvement over the previous standard does not necessarily mean that it will have no significant effect on the environment. Thank you. Thank you, counsel. Briefly, Your Honors, in response to comments made by Mr. Crockett regarding NEPA, what is going on here is plain bootstrapping. And I echo what Ms. Rosenbaum just said, but the reliance on the 2003 order cannot exempt the NRC from complying with NEPA this time around. And moreover, the NRC was doing much more than simply replicating the 2003 order. What it was doing here was promulgating a rule for all existing and potentially future reactors going forward, and it exempted them as a matter of regulation. Now, Mr. Crockett says that the NRC is interested in telling applicants for new reactors to assess air attacks as part of the licensing process. But that begs the question. Having the new reactors do that is one thing, but the existing 104 are taken off the table. The NRC is essentially tying its hands for those 104. And again, we submit that should be reviewed through NEPA and alternatives. And by its crabbed approach to NEPA here, what the NRC is doing is really bypassing an opportunity to further protect the environment. With respect to Mr. Crockett's statement about biological diversity, we recognize that the decision was amended this past August. We understand it's a remand for an environmental assessment. Again, to undertake or to reexamine the first step of the NEPA process, which is to look at is there a significant impact on the environment, and also to look at alternatives. That is also part of an EA. If your honors have no further questions, I'll conclude. Thank you very much. Thank you all for your arguments and for your briefing in this case. I know our time this morning has been limited, but I think everybody did an effective job of communicating the arguments.
judges: Hall, Nelson, Thomas